UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN



U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED

2025 MAY 20  P 3: 22

CLERK OF COURT

UNITED STATES OF AMERICA,

                Plaintiff,

        v.

JOHN MILLER and
CUI GUANGHAI, a.k.a. "JACK,"

                Defendants.

Case No. **25-CR-096**

[18 U.S.C. §§ 371, 554(a), and 2(a); 22 U.S.C. § 2778(b)(2), 2778(c); 22 C.F.R. Parts 121.1, 123.1, 126.1, 127.1(a), and 127.3]

---

## INDICTMENT

---

### COUNT ONE

**THE GRAND JURY CHARGES THAT:**

1.    Beginning in or about November 2023 and continuing through in or about April 2025 in the State and Eastern District of Wisconsin and elsewhere,

**JOHN MILLER and
CUI GUANGHAI, a.k.a. "JACK,"**

knowingly and intentionally conspired with each other and others known and unknown to the Grand Jury,

        a.    to willfully export and cause to be exported from the United States to the People's Republic of China defense articles on the U.S. Munitions List, without first having obtained a license or written approval from the United States Department of State, Directorate of Defense Trade Controls, in violation of the Arms Export Control Act ("AECA"), Title 22, United

States Code, Sections 2778(b)(2) and 2778(c); and the International Traffic in Arms Regulations

("ITAR"), Title 22, Code of Federal Regulations, Parts 121.1, 123.1, 126.1, 127.1, and 127.3; and

      b.     to knowingly and fraudulently export and send from the United States

merchandise, articles, and objects contrary to a law and regulation of the United States, in violation

of Title 18, United States Code, Section 554(a).

## Objects of the Conspiracy

2.     The objects of the conspiracy were:

      a.     to violate and evade the regulations, prohibitions, and licensing requirements of the AECA and the ITAR;

      b.     to illicitly obtain and to export various defense articles from the United States to the People's Republic of China without the requisite licenses from the Department of State;

      c.     to smuggle defense articles from the United States to the People's Republic of China in violation of federal law; and

      d.     to conceal the prohibited activities from the U.S. government and law enforcement to evade detection and criminal penalties.

## Manner and Means of the Conspiracy

3.     The conspirators used the following manner and means, among others, to accomplish the objects of the conspiracy:

      a.     MILLER and CUI used video and telephone conferencing, encrypted messaging applications, and digital platforms to communicate with each other and others regarding the quantities, prices, payment schedule, and delivery methods of U.S.-origin defense articles;

b.      MILLER and CUI solicited the procurement of U.S. defense articles, including ReAlly Simply Key Loader (RASKL) KIK-30 Type 1 cryptographic devices with Crypto Ignition Keys, missiles, air defense radar, and Black Hornet drones;

c.      MILLER and CUI transferred payment for U.S. defense articles to the United States, including via wire transfer and hand delivery; and

d.      MILLER and CUI used video and telephone conferencing, encrypted messaging applications, and digital platforms to communicate with each other and others regarding how to package and ship U.S. defense articles from the United States to the People's Republic of China in a manner that would evade detection by the U.S. government and law enforcement.

## Overt Acts

4.      In furtherance of the conspiracy and to effect and accomplish its objects, MILLER and CUI, together with others known and unknown to the Grand Jury, committed and caused to be committed one or more of the following acts in the Eastern District of Wisconsin and elsewhere:

a.      In or around November and December 2023, MILLER communicated by telephone with Individual-1 about a "Christmas wish list" that included "hardware" and "radar, technology, and stuff." MILLER stated that "they want a couple of each" in order to "reverse engineer" the technology. MILLER added that his buyers were "interested in the Western stuff," including "night vision goggles" and "the armor plates" that "go on armored vehicles and tanks that the Yanks have."

b.      On or about January 14, 2024, MILLER sent Individual-1 a list of items that MILLER wanted Individual-1 to acquire for MILLER's buyers. MILLER stated that

access to any of these items could result in a significant payment. The list included surface-to-air and antiaircraft missiles and Predator Drones.

c.     On or about February 9, 2024, MILLER used an encrypted commercial messaging application to exchange messages with Individual-1 about the "list" that he had previously provided to Individual-1. MILLER stated that "they want complete items but bear in mind this is just the top items, their list has hundreds of items, too many to list but I'm [sic] reality they are looking for almost anything they can get their hands on." MILLER further stated that the "best scenario would be that we find items for them and meet to discuss a purchase," and that "[t]heir pockets on this are very deep, it's the holy grail for us if we can facilitate." MILLER told Individual-1 that "[t]he task is finding a route to market, the funds/budget is already there, we can charge 2-3 times original price."

d.     On or about March 16, 2024, while communicating on an encrypted commercial messaging application, MILLER asked Individual-1 to enable the "secret chat" mode within the application, which removes chat handles/pseudonyms and makes the text disappear almost instantly after being read. MILLER expressed interest to Individual-1 in obtaining U.S. Department of Defense ("DOD") equipment, including military jet engines, and he directed Individual-1 to start communicating with "Jack" (referring to CUI). MILLER told Individual-1 that all conversations regarding the list need to be made on "secret chat" using the encrypted commercial messaging application. MILLER told Individual-1 that the funds to purchase U.S. equipment were available, that the equipment would be reverse engineered in the People's Republic of

China, and that the People's Republic of China was willing to pay two to three times the cost to acquire such equipment.

e.     On or about June 11, 2024, and continuing through on or about June 16, 2024, CUI and Individual-1 exchanged messages on an encrypted commercial messaging application about the plan to purchase U.S. military equipment and export and smuggle the equipment to the People's Republic of China.

f.     On or about June 26, 2024, CUI told Individual-1 that he (referring to CUI) "will get the list soon." CUI further asked to "discuss the equipment" and asked for pictures.

g.     On or about July 5, 2024, while communicating on an encrypted commercial messaging application, CUI stated that he would get back to Individual-1 as soon as possible after speaking with his client. CUI also asked what other items were available, and asked "do you have any information on the predator?"

h.     On or about July 13, 2024, in communications sent via an encrypted commercial messaging application, CUI stated that his client was "doing a report to their upper level department" and that CUI was waiting for an "evaluation report." CUI further stated that his client was "local government." CUI asked Individual-1 for a "menu for [his] client," so that CUI could show that list to his clients, and "let them pick."

i.     Beginning on or about September 10, 2024, and continuing until on or about September 24, 2024, CUI sent several messages to Individual-1 on an encrypted commercial message application. CUI expressed interest in, and set forth proposed prices for, various defense articles, including "[t]wo new version of the stinger,"

explaining that "for the newest stinger they're offering 50,000 USD"; "[t]wo black bee drones," for which they were "offering US $200,000 per set"; "AGM-88E anti-radiation missile," for which they were "offering US $900,000"; and "AN-MPQ-64 air defense radar," for which they were "offering 2 million USD."

j.    In this same set of messages, CUI detailed his clients' desire for "[t]hings like software, Black hornet, or some intelligence information [that] will be easy to handover." CUI continued by explaining that, "[t]he buyer suggest [sic] we start on this kind of things to begin with," and noted that for some items "we can mark up at least 20 to 30% for shipping." During that text conversation, CUI also stated that "John" (referring to MILLER) would register a "new account," and that MILLER "will share [it with] you when he got the new Sim card and new phones."

k.    From on or about January 18, 2025, through on or about February 11, 2025, in messages sent on an encrypted commercial messaging application, CUI told Individual-1 that he would send a new list of items after the Chinese New Year and asked Individual-1 if Black Hornet drones were still available. CUI informed Individual-1 that the drones would be handled by "my guys in South Korea." CUI also asked Individual-1 twice if he had Global Positioning Systems ("GPS") used by "individual foot soldiers."

l.    Between on or about February 14, 2025, and on or about February 18, 2025, CUI and Individual-1 continued to discuss the purchase of handheld GPS units. CUI stated that "for the GPS also we need very specific information, such as pictures [of] serial number," and that "after you send all the pictures of GPS [he] will let you know how many that we want." CUI then added that, "[t]his report will bring the deposit."

CUI told Individual-1 that "these are not my request, these are my client's request . . . . Please understand I'm just passing information and request between you and the client." During the text exchange, Individual-1, who was in the Eastern District of Wisconsin, sent CUI photos of two GPS handheld units that Individual-1 had procured and that were also in the Eastern District of Wisconsin.

      m.    On or about March 7, 2025, CUI and Individual-1 exchanged messages regarding a possible meeting in Hungary. In the messages, CUI said to Individual-1 that "hopefully we can meet together with john [MILLER] in Hungary."

      n.    From on or about March 24, 2025, through on or about April 1, 2025, Individual-1 sent CUI pictures of a RASKL KIK-30 Type 1 and a Crypto Ignition Key piece that would be inserted into the RASKL, which were in the Eastern District of Wisconsin, telling CUI it is a "cryptographic encoding decoding device." CUI stated that he "forwarded it to my guys." Later, CUI asked Individual-1 if the cryptographic equipment devices Individual-1 sent to CUI still had the keys. CUI said, "I sent it to my guy those equipment. They were asking if those equipment have the keys. I think those keys issued by the military," and "it's a kind of code to connect the GPS and the satellite."

      o.    On or about April 7, 2025, CUI sent Individual-1 an image of a handheld device with text circled on the device's screen. CUI told Individual-1, "we need to have this type of key to activate the GPS." CUI informed Individual-1 that, "we have 2 GPS" "without keys," and inquired into the price of the keys. During that text conversation, CUI added: "If the equipment with the encryption keys, my guys are very interested"; and "The equipment worth good money money [sic] with the keys."

p.    Also on or about April 7, 2025, CUI and Individual-1 discussed a downpayment for the encryption keys, specifically the RASKL KIK-30 and Crypto Ignition Key. CUI stated, "Ill [sic] send you 30 K in total, 15K for the job, 5K that I owe you, 10 K for deposit." CUI then offered to have a contact in the Los Angeles, California, area give Individual-1 cash as a deposit. CUI messaged Individual-1: "I have 20 k ready in cash in LA right now, and for the deposit 10 K, I have 3500 ready to wire to [an] account [Individual-1 provided], should I send the 3500 to this account." Later, CUI messaged Individual-1 to say "6500 also ready in cash, so you can pick up 26,500 in total, 3500 wire transfer to the account."

q.    On or about April 9 and 10, 2025, CUI, MILLER, Individual-1, and Individual-2 had calls over an encrypted messaging platform to discuss the procurement and smuggling of a RASKL KIK-30 and Crypto Ignition Key from the United States to the People's Republic of China. On or about April 9, 2025, for example, during a video teleconference, CUI, Individual-1, and Individual-2 discussed shipping the RASKL encryption device and Crypto Ignition Key. CUI stated that he had "guys in LA" who could "risk it." CUI mentioned that his buyers needed encryption keys for other systems as well and asked for more details from Individuals 1 and 2 regarding what they could procure. CUI stated that "China is not an ally of NATO or [the United States]," and that it was hard to ship there. CUI further stated that encryption materials were "restricted" and that it was "impossible for anyone in China to get that stuff." CUI told Individual-1 and Individual-2 that his clients were focused on products like "keys" "without shipping" because "that's easy and no risk."

r.      On or about April 10, 2025, during a video teleconference, CUI, MILLER, Individual-1, and Individual-2 discussed different ways to ship the RASKL device and Crypto Ignition Key to the People's Republic of China. CUI discussed shipping a computer or another object and putting the device inside. MILLER discussed concealing the device inside a shipment for small electronics or machinery to Hong Kong, or with car parts such as a starter motor. MILLER also suggested using a food mixer or blender to smuggle the device by gluing it somewhere inside the mixer or blender. MILLER stated that the package including the blender and device could be sent via DHL or FedEx to Hong Kong and that CUI could arrange for pick up in Hong Kong. CUI agreed.

s.      During the video teleconference, MILLER, CUI, Individual-1, and Individual-2 also discussed the procurement of Stinger missiles. MILLER stated that Stingers were "a whole different challenge" and that they could discuss procurement of those when they met in person.

t.      During the April 9 and April 10, 2025, calls, MILLER and CUI continued to discuss plans to conceal the exports for shipment following these exchanges. MILLER and CUI were reminded that the proposed export from the United States was illegal. For example, Individual-1 explained to MILLER and CUI on the April 10, 2025, call that they were not using licenses to ship anything. On the April 9, 2025, call, Individual-1 explained to CUI that normally they would need to have signed "end user agreements" and "contracts" to ship the RASKL and Crypto Ignition Key, and that they could "get into serious trouble for this."

u.      Nonetheless, on or about April 12, 2025, at the direction of CUI, a wire transfer for $3,500 was made from a bank in the Los Angeles area to the bank account provided to CUI for a portion of the deposit. That account was registered to an individual located in the Eastern District of Wisconsin. CUI caused the remainder of the deposit to be paid via cash.

v.      On or about April 15, 2025, MILLER and Individual-1 spoke about an upcoming trip to Hungary. MILLER and Individual-1 again discussed how to package the RASKL device and Crypto Ignition Key to avoid detection. During the April 15, 2025 call, MILLER also shared his and CUI's travel plans to Hungary. Individual-1 told MILLER that "we're gonna meet some of the guys that do you know like trucking . . . if it's not [a good fit], we can use your Bulgarian connection." MILLER replied, "I'd rather use my own people to be honest," and "these guys are running trucks in and out of there all the time, they've got a whole European operation" because "it's free movement in the Schengen zone." MILLER told Individual-1 that about "this much bigger thing" he would find a significant buyer for Individual-1's products who was "using this stuff every day."

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

**THE GRAND JURY FURTHER CHARGES THAT:**

Beginning by at least in or about November 2023, and continuing through in or about April 2025, in the State and Eastern District of Wisconsin and elsewhere,

**JOHN MILLER**
**and**
**CUI GUANGHAI aka "JACK,"**

attempted to export from the United States to the People's Republic of China a defense article, namely a ReAlly Simply Key Loader (RASKL) KIK-30 Type 1 cryptographic device with associated Crypto Ignition Key, which was designated as a defense article on the U.S. Munitions List, without first having obtained a license and written approval for such export from the United States Department of State, Directorate of Defense Trade Controls.

All in violation of Title 22, United States Code, Sections 2778(b)(2), 2778(c) and Title 22, Code of Federal Regulations, Parts 121.1, 123.1, 126.1, 127.1, and 127.3 and Title 18, United States Code, Section 2(a).

## COUNT THREE

**THE GRAND JURY FURTHER CHARGES THAT:**

Beginning by at least November 2023, and continuing through April 2025 in the State and Eastern District of Wisconsin and elsewhere,

**JOHN MILLER
and
CUI GUANGHAI aka "JACK,"**

knowingly attempted to export and send from the United States to the People's Republic of China merchandise, articles, and objects, namely a ReAlly Simply Key Loader (RASKL) KIK-30 Type 1 cryptographic device with associated Crypto Ignition Key, contrary to Title 22, United States Code, Section 2778, and Title 22, Code of Federal Regulations, Parts 120-130, and receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of such merchandise, articles, and objects, prior to exportation, knowing the same to be intended for exportation from the United States to the People's Republic of China, contrary to the AECA and the ITAR.

In violation of Title 18, United States Code, Sections 554(a) and 2(a).

## FORFEITURE NOTICE

1.  Upon conviction of one of more of the offenses alleged in Counts 1 through 3 of this Indictment, the defendant(s) shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c); Title 21, United States Code, Section 853; and Title 22, United States Code, Section 401, any property, real or personal, which constitutes or is derived from proceeds traceable to the offense(s) of conviction, or conspiracy to commit such offense(s). The property to be forfeited includes, but is not limited to, a sum of money equal to the proceeds derived from the offense(s) of conviction.

2.  If any of the property described above, as a result of any act or omission by the defendant(s): cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c).

A TRUE BILL·

FOREPERSON

Dated: 5/20/2025

RICHARD G. FROHLING
Acting United States Attorney